**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PATRICIA MURPHY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 15 CV 8919** |
| **v.** | ) | |
| | ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of the U.S. Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Patricia Murphy ("Claimant") seeks judicial review under 42 U.S.C. §

405(g) of a final decision of Defendant Commissioner of the Social Security

Administration ("SSA") denying her concurrent application for Social Security Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act") and

Supplemental Security Insurance ("SSI") under Title XVI of the Act. *See* 42 U.S.C. §

423; 20 C.F.R. § 416.110. The parties have consented to the jurisdiction of the United

States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow,

Claimant's motion for reversal or remand is granted and the Commissioner's motion for

summary judgment is denied. The case is remanded to the SSA for proceedings

consistent with this opinion.

## BACKGROUND

### I.     Procedural History

Claimant filed a concurrent DIB and SSI application on August 8, 2011 alleging

an onset date of January 1, 2011 due to anxiety, high blood pressure, leg and back

problems, as well as agoraphobia.  (R. 324, 341.)  The applications were denied initially on September 7, 2011 and upon reconsideration on February 8, 2012.  (R. 164-67.) After both denials, Claimant filed a hearing request, which was scheduled on October 22, 2013 before an Administrative Law Judge ("ALJ").  (R. 48-105, 188-89.)  The hearing was continued to February 11, 2014 for further testimony from Claimant.  (R. 106-63.)  Claimant appeared for both hearings along with her representative.  (*Id.*)  A Vocational Expert ("VE") was also present to offer testimony.  (*Id.*)  On June 27, 2014, the ALJ issued a written opinion finding that Claimant was not disabled and denying her DIB and SSI applications.  (R. 16-40.)  Claimant sought review by the Appeals Council, which was denied on September 18, 2015.  (R. 1-3.)

## II.    Medical Evidence

On April 18, 2009, Claimant was treated at the Norwegian American Hospital for chest tightness and pain.  (R. 429.)  An exam of the chest showed "no acute infiltrates" and "mild blunting of right costophrenic angle."  (R. 438.)  She was diagnosed with anxiety and discharged in good condition.  (R. 440.)

Records reveal that Claimant is a patient of Mount Sinai Hospital ("Mount Sinai") and has been receiving regular treatment for complaints of dizziness and abdominal pain.  Claimant had a CT scan of her pelvis and abdomen on June 23, 2008, which revealed normal results.  (R. 456.)  On January 14, 2009, after a complaint of dizziness, Claimant underwent a cranial scan, which showed "no evidence of extracranial or vertebral artery occlusive disease."  (R. 476.)  On March 10, 2009, Dr. Joseph Rosman noted "she [was] doing well," but planned to conduct a pulmonary function test.  (R. 747.)  On April 9, 2009, Claimant returned to Mount Sinai with complaints of chest pain.

A CT scan revealed normal results with "no evidence of pulmonary emboli." (R. 496.) A chest scan on the same day showed "grossly normal" results. (R. 497.) On August 30, 2010, Claimant returned to Mount Sinai due to chest pains and dizziness. (R. 575.) She received a CT scan of the brain, which was normal. (R. 528.) An MRI of her brain showed no abnormalities. (R. 530.) She was discharged home on September 2, 2010 with a diagnosis of dizziness and hypertension. (R. 576, 708.)

On October 27, 2013, Claimant was admitted to Mount Sinai due to abdominal pain that woke her from her sleep. (R. 1348.) A CT scan of her abdomen and pelvis were unremarkable. (*Id.*) The medical staff noted that her pain was likely caused by constipation. (R. 1358.) She reported to hospital staff that she remained anxious due to her relationship with her estranged husband. (R. 1331.) She was referred to the psychiatry department for evaluation. (*Id.*) She was advised to continue Zoloft for her anxiety and depression. (R. 1346.) She was discharged from the hospital on October 30, 2013. (R. 1345-46.)

Claimant has also been treated at Lawndale Christian Health Center ("LCHC") since 2009. (R. 752-53.) On February 23, 2009, she was diagnosed with shingles and hypertension and prescribed medication as treatment. (R. 749-50.) On April 22, 2009, the attending physician noted that Claimant's dizziness may be due to her high dosage of medication and advised her to stop taking Benazepril and Lopressor. (R. 742.) On June 23, 2009, she reported to LCHC due to crying spells and was diagnosed with depression. (R. 735.) She was prescribed Lexapro. (R. 736.)

On October 26, 2010, Claimant was admitted to the emergency room at LCHC after complaints of dizziness. (R. 701.) The attending physician opined that her

dizziness may be due to an ear infection. (R. 702.) During a follow-up appointment on November 19, 2010, Claimant stated that she was feeling better and that her dizziness had improved. (R. 698.) On December 22, 2010, Claimant completed a survey and noted that she frequently felt nervous, could not control her worries, had trouble relaxing, and feared that something awful may happen. (R. 783.) She commented that she was often bothered by stomach and back pains, pain in the arms, legs, and joints, chest pains, headaches, and dizziness. (*Id.*) The attending physician noted that her symptoms were likely due to anxiety, depression, and stress. (R. 786.)

On August 12, 2011, Claimant called LCHC to ask for a letter "for SS disability stating she has panic attacks." (R. 1017.) On May 10, 2012, Claimant completed another survey with largely the same answers regarding her mental and physical well-being. (R. 1181-82.) She was diagnosed with Post-Traumatic Stress Disorder ("PTSD") due to past experiences in her life including her sister's death in 2008. (R. 1141.) On August 13, 2012, the attending physician noted that her condition was stable and that she has good days and bad days. (R. 1196.) She had been compliant with her Zoloft. (*Id.*) A record from September 11, 2012 reveals that Claimant "continues to get out of the house more and engage in enjoyable activities." (R. 1205.) However, she had experienced recent stress due to harassment from her estranged husband. (*Id.*) On December 15, 2012, Claimant was able to independently leave her apartment and pick up her medications. (R. 1213.) But on May 7, 2013, Claimant reported living in isolation once again and had discontinued all social activities, including going to church. (R. 1080.) Claimant continued to visit LCHC through January 29, 2014 and treatment notes indicated that her condition fluctuated. (R. 1087, 1104, 1292, 1297, 1312.)

On January 21, 2011, Dr. Nathan Wagner completed a formal mental status examination for the Bureau of Disability Determination Services ("DDS").  (R. 580-87.)  Dr. Wagner's diagnostic impression was that Claimant had panic disorders with agoraphobia and depressive disorder.  (R. 585.)  Claimant had several crying spells during the evaluation, but was able to "pull herself together after several minutes."  (R. 583.)  She was able to interact appropriately throughout the evaluation.  (*Id.*)  On the same day, Dr. Norbert De Biase of DDS completed an internal medicine consultative examination.  (R. 588-96.)  His clinical impression was that Claimant had high blood pressure, vertigo, chest pain, anxiety, and depression.  (R. 591.)  However, the examination returned mostly normal results as she had normal dexterity, normal range of motion, and no physical limitations.  (R. 93-97.)

On August 23, 2011, Dr. Marion Panepinto completed a physical Residual Functional Capacity ("RFC") assessment for hypertension and vertigo.  (R. 964-71.)  Dr. Panepinto found Claimant did not have any exertional, manipulative, visual, or communicative limitations, but found Claimant should only occasionally climb stairs and balance, and should avoid hazardous machinery.  (R. 965, 968.)  Dr. Panepinto found Claimant's allegations regarding her physical limitations to be partially credible based upon the medical evidence.  (R. 971.)

On September 1, 2011, Dr. Elizabeth Kuester completed a mental RFC assessment and a Psychiatric Review Technique Form ("PRTF"), evaluating Claimant under listing 12.04 for affective disorders and 12.06 for anxiety-related disorders.  (R. 972-889.)  Dr. Kuester noted that Claimant was impaired by depression, a persistent irrational fear of a specific object, activity, or situation, as well as recurrent severe panic

attacks "manifested by sudden unpredictable onset of intense apprehension, fear, or terror." (R. 975, 977.) With regard to Claimant's functional limitations, Dr. Kuester found that Claimant was mildly limited in activities of daily living and maintaining concentration, persistence, and pace. (R. 982.) Claimant would be moderately limited in certain areas of understanding and memory and sustained concentration and persistence. (R. 986-87.) Specifically, Dr. Kuester noted that Claimant would be moderately limited in the ability to carry out detailed instructions and maintain attention and concentration for extended periods. (R. 986.) She would also be moderately limited in the ability to complete a normal workday, interact appropriately with the general public, accept instructions and respond appropriately to criticism, travel to unfamiliar places, and set realistic goals. (R. 987.) Dr. Kuester concluded, after reviewing the overall medical evidence, that Claimant could learn and perform simple, routine tasks adequately with ordinary instruction and supervision, but that she should not be required to interact extensively or deal with the public. (R. 988.) She would be able to relate with supervisors and coworkers to a minimal and superficial extent. (*Id.*)

On June 7, 2012, a physician completed another mental RFC statement.[1] (R. 1066-69.) It was noted that it was "most likely" the case that Claimant's conditions had prevented her from working since December 2010. (R. 1066.) Claimant's prognosis was "poor." (*Id.*) The physician found that Claimant would be precluded from performing activities within a schedule, working in coordination with others, completing workday tasks, interacting appropriately with the public, accepting instructions, interacting with coworkers, responding to changes in the work setting, traveling to unfamiliar places, and maintaining socially acceptable behavior for 15 percent or more

_____

[1] The physician's signature is illegible, but Claimant argues in her brief that it is Dr. Karla Torres.

of a typical workday.  (R. 1067-68.)  The physician also opined that Claimant would be precluded from performing more than 30 percent of an eight-hour workday, would be absent from work or unable to continue a workday for five days or more, and could not efficiently perform a full-time job.  (R. 1068.)  The physician concluded that based on her conditions, Claimant would be unable to obtain and retain full-time work in a competitive work environment.  (R. 1069.)

## III.    Claimant's Testimony

Claimant was present at the hearing on October 22, 2013 and testified before the ALJ.  (R. 48.)  At the time of the hearing, Claimant was married with four adult children.  (R. 55.)  She does not work and relies on her children to provide for her.  (R. 56.)  Claimant testified that she last worked in June 2009 as a Child Development Assistant for a social service non-profit organization.  (R. 59-60.)  She performed administrative duties until she was laid off.  (R. 62.)  Claimant explained that she believed she became disabled on January 1, 2011, but not because of a specific event or hospitalization.  (R. 63.)  She testified that she is unable to work because she is afraid of being outside.  (R. 68.)  She further stated that she has felt scared since 2009.  (*Id.*)

With regard to physical impairments, Claimant testified that she sometimes cannot walk because she has trouble moving her arms and legs.  (R. 69.)  Claimant can walk about thirty feet independently.  (R. 94-95.)  She also has pain in her neck and shoulders, which her doctors told her was caused by stress and high blood pressure.  (R. 72.)

Claimant further stated that she has emotional problems that make her "very sad."  (R. 74.)  She has trouble sleeping and sleeps for only about four hours every

night.  (R. 77.)  Claimant testified that she began seeking treatment at a behavioral health clinic beginning December 2010.  (R. 78.)  She received counseling while there. (R. 79.)  Claimant further testified that she occasionally experiences panic attacks, which can last anywhere from two days to a week.  (R. 86.)

On a typical day, Claimant wakes up at 6 a.m. and proceeds to walk around her apartment until 10 a.m.  (R. 89.)  She then cooks breakfast, takes a shower, and goes to her room.  (*Id.*)  She does not cook otherwise and does not clean, but sometimes washes the dishes.  (R. 90.)  Generally, her children help her with household chores. (R. 127.)  She cannot pay the bills due to her memory problems.  (R. 130.)  She also forgets to take her medication.  (*Id.*)  Claimant testified that she used to walk her granddaughter to school, but can no longer take her because she was "just scared."  (R. 91.)  She further testified that she spends her day reading the bible and watching television.  (R. 92.)

The hearing reconvened on February 11, 2014.  (R. 106.)  Claimant's attorney stated that after the previous hearing, Claimant was hospitalized for emotional distress for a few days.  (R. 111.)  The ALJ then asked Claimant to explain the lack of medical records from September 2011 through July 2013.  (R. 119.)  Claimant responded that she believed she was treated during this period but did not know where the records were.  (*Id.*)  Claimant then testified that she feels unsafe in the house without her children because her husband, whom she is separated from, has previously entered the home and attacked her.  (R. 123.)  She continues to fear public places and crowds because of her negative experiences with men.  (R. 124-25.)  She thinks about killing herself every other week.  (R. 137-38.)

Claimant further testified that her medication makes her feel grouchy, keeps her awake, and gives her headaches.  (R. 139, 141-42.)

IV.     **VE's Testimony**

A VE was present at the second hearing and offered testimony.  The VE first classified Claimant's previous job as being akin to a nursery school attendant, described as a light occupation of a semiskilled nature that she performed at an unskilled, medium exertional level.  (R. 151.)  The ALJ then asked the VE whether an individual without exertional limitations, who cannot work on moving surfaces, but has the RFC to perform and sustain simple, repetitive, unskilled work, would be able to perform Claimant's past relevant work as previously described.  (R. 152.)  The VE opined that it would not be feasible due to the limitations in interacting with the general public.  (*Id.*)  However, the VE believed that such an individual would be able to perform the responsibilities of an assembler, packing line worker, and a sorter.  (R. 153.)  The VE further testified that these positions require minimal social interaction.  (R. 154.)  The jobs would include three regular breaks and the individual may not be absent for more than ten days in a year.  (*Id.*)  The individual could not be off-task for more than ten percent of the workday.  (R. 155.)  The VE testified that if the individual were distracted frequently, it would preclude any prior work and competitive employment.  (*Id.*)

**LEGAL ANALYSIS**

I.     **Standard of Review**

Because the AC denied review, the ALJ's findings constitute the final decision of the agency.  (R. 1-3); *see Herron v. Shalala*, 19 F.3d 329, 332 (7th Cir. 1994).  The findings of the ALJ as to any fact, if supported by substantial evidence, shall be

conclusive.  42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir.

2002); 42 U.S.C. § 1383 ("The final determination of the Commissioner after a hearing

under paragraph (1) shall be subject to judicial review as provided in section 405(g) of

this title to the same extent as the Commissioner's final determinations under section

405 of this title.")  Although the court affords great deference to the ALJ's determination,

it must do more than merely rubber stamp the ALJ's decision.  *See Griffith v. Sullivan*,

916 F.2d 715 (7th Cir. 1990) (citing *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986)).

In order to affirm the ALJ's decision, the court must find the decision to be supported by

substantial evidence on the record as a whole, and must take into account whatever in

the record fairly detracts from its weight.  *See Universal Camera Corp. v. N.L.R.B.*, 340

U.S. 474, 488 (1951).  Substantial evidence is more than a mere scintilla; it is such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.  *See Kepple v. Massanari,* 268 F.3d 513 (7th Cir. 2001) (citing *Richardson

v. Perales*, 402 U.S. 389, 401 (1971)).

   The court may not displace the ALJ's judgment by reconsidering facts or

evidence or making credibility determinations.  *See Skinner v. Astrue*, 478 F.3d 836,

841 (7th Cir. 2007).  Where conflicting evidence allows reasonable minds to differ as to

whether a claimant is disabled, the responsibility for that determination falls upon the

ALJ, not the courts.  *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).  An ALJ

must articulate her analysis by building an accurate and logical bridge from the

evidence to her conclusions, so that the court may afford the claimant meaningful

review of the ALJ's ultimate findings.  *See Pepper v. Colvin*, 712 F.3d 351 (7th Cir.

2013).  It is not enough that the record contains evidence to support the ALJ's decision

and the court must remand if the ALJ does not rationally and sufficiently articulate the grounds for that decision, so as to prevent meaningful review.  (*Id.*)

## II.      Analysis under the Social Security Act

To qualify for benefits, a claimant must be under a disability within the meaning of the Act.  *See* 42 U.S.C. § 423(a)(1)(E).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002). Pursuant to the Act, Claimant is disabled only if her physical or mental impairments are of such severity that she is unable to do her previous work and cannot, when "considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which she lives, or whether a specific job vacancy exists for her, or whether she would be hired if she applied for work."  42 U.S.C. § 423(d)(2)(A).  Another agency requirement to receive disability insurance benefits is that Claimant must show she was disabled on or before the date her insured status expired.  *See* 20 C.F.R. § 404.130 for definition of insured status; *see also Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).

Under the authority of the Act, the SSA has established a five-step sequential evaluation process for determining whether Claimant is disabled.  *See* 20 C.F.R. § 404.1520(a).  This five-step sequential evaluation process requires the ALJ to inquire:

1.      Is Claimant presently engaging SGA?  *See* 20 C.F.R. § 404.1572 *et seq.*

2.      Does Claimant have a severe medically determinable physical or mental

impairment that interferes with work and is expected to last at least 12 months?

3.      Does the impairment meet or equal one of a list of specific impairments

enumerated in the regulations?  *See* 20 C.F.R. § Pt. 404, Subpt. I, App. 1.

4.      Is Claimant unable to perform her former occupation?

5.      Is Claimant unable to perform any other work?

20 C.F.R. § 404.1520(a)(4); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

Claimant has the burden of establishing steps one through four.  At step five the burden

shifts to the Commissioner to establish that Claimant is capable of performing work.

*See Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**III.    ALJ's Determination**

Here, the ALJ applied the five-step analysis in her decision to deny benefits.  As

an initial matter, the ALJ determined that Claimant met the insured status requirements

of the Act through December 31, 2014 for the purposes of her DIB application.  (R. 22.)

At step one, the ALJ found that Claimant has not engaged in substantial gainful activity

since her alleged onset date of January 1, 2011.  (*Id.*)  At step two, the ALJ determined

that Claimant suffered from the severe impairments of depression, anxiety, and PTSD

(*Id.*)  At step three, the ALJ found that Claimant did not have an impairment or a

combination of impairments that meet or medically equal the severity of one of the listed

impairments of 20 C.F.R. Part 404, Subpart P, App'x 1.  (R. 23-24.)

Before step four, the ALJ determined that Claimant has no exertional limitations

and has the mental RFC to perform and sustain a wide range of simple, repetitive,

unskilled work.  (R. 38.)  The ALJ further found that Claimant has the ability to

understand, remember, and carry out simple, routine instructions. (*Id.*) Furthermore, she found Claimant capable of "adapting to the type of changes that would be expected in a work setting, making the type of decision that would be required, and exercise the type of judgment needed for such work." (*Id.*) The ALJ determined Claimant could respond appropriately to superficial contact with supervisors and coworkers, but should not work with the general public. (*Id.*) In so finding, the ALJ gave great weight to the state agency psychological consultants' mental RFC assessments because they are "generally consistent with and supported by the evidence of record." (R. 32.) The ALJ also found that Claimant has not generally received "the type of medical treatment one would expect for a totally disabled individual." (R. 36.) The ALJ also did not find Claimant's allegation to be credible. (R. 38.) At step four, the ALJ determined that Claimant is unable to perform past relevant work. (*Id.*) However, at step five, after considering Claimant's age, education, work experience, and RFC, the ALJ found jobs existing in significant numbers in the national economy that Claimant could perform, such as an assembler, packing line worker, and sorter. (R. 39.)

## DISCUSSION

In challenging the ALJ's decision, Claimant proffers two arguments for the Court's review. First, Claimant contends that the ALJ's credibility determination was not supported by substantial evidence as it was based on legally improper inferences and factual errors. (Pl. Mot. at 5-12.) Next, Claimant argues that the ALJ improperly rejected the medical opinion of Dr. Karla Torres, a mental health professional from LCHC. (Pl. Mot. at 12-15.) The Court agrees on both counts.

## I.    Credibility Determination

Since the ALJ issued her decision in this case, the SSA has issued new guidance on how the agency assesses the effects of a claimant's alleged symptoms. Specifically, SSR 96-7p and its focus on "credibility" has been superseded by SSR 16-3p in order to "clarify that subjective symptom evaluation is not an examination of the individual's character." *See* SSR 16-3p, 2016 WL 1119029, at *1. As SSR 16-3p is simply a clarification of existing law, rather than a change to it, it can be applied to Claimant's case. *See Qualls v. Colvin*, No. 14 CV 2526, 2016 WL 1392320, at *6 (N.D. Ill. Apr. 8, 2016); *Hagberg v. Colvin*, No. 14 CV 887, 2016 WL 1660493, at *6 (N.D. Ill. Apr. 27, 2016).

In any event, under SSR 16-3p the court will review the ALJ's determination in much the same way as previously done. *See Cole v. Colvin*, No. 15-3883, 2016 WL 3997246, at *1 (7th Cir. July 26, 2016) ("The change in wording is meant to clarify that [ALJs] aren't in the business of impeaching claimants' character; obviously [ALJs] will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence.") As before, the ALJ must carefully consider the entire case record and evaluate the "intensity and persistence of an individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 16-3p at *2. The ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *See Goble v. Astrue*, 385 Fed. Appx. 588, 593 (7th Cir. 2010). However, the ALJ need not mention every piece of evidence so long as she builds a logical bridge from the evidence to her conclusion. *See Craft v. Astrue*, 539

F.3d 668, 673 (7th Cir. 2008). Consequently, the court will only reverse the ALJ's credibility finding if it is patently wrong. The ALJ's credibility determination is patently wrong if it lacks "any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008.)

In making a credibility determination, the ALJ "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." *Knight*, 55 F.3d at 314. Rather, SSR 16-3p requires the ALJ to consider familiar factors in addition to the objective medical evidence, including: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain or other symptoms; (3) factors that precipitate and aggravate the symptoms, (4) the type, dosage, effectiveness and side effects of medication; (5) any treatment, other than medication, for relief of pain or other symptoms; (6) any measures the claimant uses to relieve the pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p at *7.

In her decision, the ALJ concluded that Claimant's subjective allegations were not supported by the medical record and were inconsistent with the RFC that she assigned. (R. 38.) In so finding, the ALJ rendered an adverse credibility determination and provided several reasons. First, the ALJ found that Claimant "has not generally received the type of medical treatment one would expect for a totally disabled individual." (R. 36.) Specifically, the ALJ seemed to fault Claimant for significant gaps in her mental health treatment and characterized the treatment she did receive as "routine" and "conservative" on an infrequent basis. (*Id.*)

In assessing credibility, "infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding but the ALJ 'must not draw any inferences' about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care." *Craft*, 539 F.3d at 679. Here, the ALJ made several unfair inferences against Claimant. First, she found Claimant's infrequent treatment to be fatal to her credibility without regard to the nature of Claimant's mental health impairment. As Claimant correctly points out, she frequently suffers from panic attacks and agoraphobia. Medical records indicate, and she herself testified at the hearing, that she is often afraid to leave the house as she feels anxious and unsafe. (R. 124-25, 1079, 1085.) While the ALJ acknowledged the extreme signs of anxiety and panic from the medical records, she found that they "generally indicate that claimant is able to engage and cooperate with treating sources." (R. 36.) She also found that Claimant was able to go to church. (*Id.*) Moreover, the ALJ found Claimant to be incredible because she was able to manage her symptoms while on medication. (*Id.*)

While the medical records from LCHC do show periods of improvement, they were followed by periods in which Claimant "isolate[d] herself" more. (R. 1082.) There were periods where she did not want to leave the house. (R. 1079.) Because of her anxiety, she also often missed therapy sessions and church as she only wanted to "stay in her room." (R. 1080, 1082.) Thus, while the ALJ focused on the parts of the treatment notes that showed improvement, she failed to address the fact that the treatment notes also clearly documented Claimant's fluctuating condition.

The Commissioner points out that the Claimant does not dispute the ALJ's finding of improvement in the medical record. But the issue here is that the ALJ's

negative inferences exemplify a misunderstanding of mental illness often criticized by the Seventh Circuit. *See Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) ("But mental illness in general…may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment."). While Claimant may have shown improvement at times with medication, it has been acknowledged that the nature of her mental condition may cause her compliance with medication to be erratic, which could then lead to fluctuating levels of functional capacity.

The ALJ also seems to believe that Claimant's mental impairments could not be as severe as alleged because she did not receive "the type of medical treatment one would expect for a totally disabled individual." (R. 36.) But the treatment notes from LCHC from 2009 through 2014 show that Claimant has continued to complain of and receive behavioral health treatment for her depression, anxiety, and PTSD. (R. 1088, 1147, 1161, 1213, 1301.) Furthermore, to make such a determination, the ALJ had to "play doctor," which is impermissible. *See Clifford*, 227 F.3d at 870 (holding that an ALJ must not substitute her own judgment for a physician's opinion without relying on other medical evidence or authority in the record); *see also Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) (warning that judges, including [ALJs] of the [SSA], must be careful not to succumb to the temptation to play doctor); *see also Dixon v. Massanari*, 270 F.3d 1171, 1177-78 (7th Cir. 2001). The ALJ is not a medical professional and therefore should not have relied on her own interpretation of the type of medical treatment one "should" receive in order to be considered disabled. The Commissioner attempts to shift this error onto Claimant for failing to cite reasons for her lack of psychiatric treatment, but this misses the point. The ALJ should not have substituted her own

judgment with that of a medical professional, which is what she did here.  *See Clifford*, 227 F.3d at 870.

Next, the ALJ did not find Claimant credible because of her ability to engage in certain activities of daily living.  (R. 37.)  Specifically, the ALJ acknowledged that while her activities were limited, they could not be verified with "any reasonable degree of certainty."  (R. 37.)  The ALJ only reasoned that the "weak medical evidence" did not support the degree of limitation as shown in her daily activities.  (*Id.*)  But it was not enough for the ALJ to conclude that there was a dearth of evidence supporting her allegations regarding her daily activities.

An ALJ may consider a claimant's daily activities when assessing credibility, *see Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007), but ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence.  *See Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011); *see also Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009); *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).  The ALJ's cursory analysis of Claimant's daily activities here failed to explain any such inconsistencies.  Moreover, the ALJ once again raised the issue of Claimant's failure to follow-up on referrals for psychiatric treatment, but does not explain how this is relevant to Claimant's allegation regarding her limited ability to perform daily activities.  While there is evidence to suggest that Claimant may have only mild limitations in performing activities of daily living, such as the September 1, 2011 PRTF completed by Dr. Kuester, the ALJ failed to make any mention of this evidence and therefore failed to build an accurate logical bridge from the evidence to her conclusion.  *See Craft,* 539 F.3d at 677.

Overall, the ALJ's credibility determination was not based on the subjective evidence and therefore cannot be upheld.  Notwithstanding the reasons above, the ALJ also made several other errors in assessing Claimant's credibility.  Shockingly, the ALJ reasoned that Claimant was not credible because she continued to "voluntarily interact" with her husband though she accused him of abuse.  The ALJ also did not believe Claimant's allegation of self-harm because she never reported the injuries and never received treatment.  As Claimant correctly points out, this is simply not the case as the record documents instances in which she reported wanting to inflict self-harm, as well as suicidal ideations.  (R. 1081, 1170, 1201.)  The ALJ instead points to Claimant's field office interview, in which her documented lack of difficulty with "hearing, reading, breathing, understanding, coherency, concentration, talking, answering, sitting, standing, walking, seeing, using hands or writing" apparently shows support for the ALJ's adverse credibility determination.  (R. 38.)  Yet the court fails to understand how Claimant's physical capabilities during one interview render her allegations regarding her years of suffering from a mental impairment incredible.  For reasons such as these, the ALJ's adverse credibility determination is simply not supported by the record.  On remand the ALJ must reassess Claimant's credibility in light of all the evidence of record.  *See Ribaudo v. Barnhart*, 458 F.3d 580, 584-85 (7th Cir. 2006) (remanding where ALJ's adverse credibility determination was not supported by record); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002); *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)

## II.     Medical Opinion

Next, Claimant argues that the ALJ improperly rejected the medical opinion of Dr. Torres, a psychologist who treated Claimant during her visits to LCHC.

The treating physician rule, 20 C.F.R. § 404.1527(d)(2), "directs the [ALJ] to give controlling weight to the medical opinion of a treating physician if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence." *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). "If the treating physician's medical opinion is well supported and there is no contradictory evidence, there is no basis on which the [ALJ], who is not a physician, could refuse to accept it." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). But once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight and at that point, the medical opinion is just one more piece of evidence for the ALJ to weigh. *Id.* The treating-physician rule goes on to list various factors that the ALJ should consider, such as how often the treating physician has examined the claimant, whether the physician is a specialist in the condition claimed to be disabling, and so forth.

Here, the ALJ accorded Dr. Torres' medical opinion "little weight," and took issue with how infrequently she treated Claimant. (R. 33.) While true, other regulatory factors of 20 C.F.R. § 404.1527 seem to favor giving more weight to Dr. Torres' opinion. First, as a psychologist at LCHC, she is a specialist in her field and thus is in the best position to provide an accurate picture of Claimant's mental impairments. Though she may not have provided Claimant with frequent treatment, she is the only psychologist on record to have treated Claimant consistently while she was visiting LCHC. Dr. Torres also noted that she based her medical assessment on one diagnostic interview and several

counseling visits over the course of two years.  (R. 1069.)  Rather than reference evidence to contradict Dr. Torres' opinion, the ALJ discredited her simply because she believed that the diagnostic interview and counseling sessions were not enough evidence to support her medical opinion.  This is not what the treating physician rule directs the ALJ to do.  *See Bauer*, 532 F.3d at 608.

Claimant also correctly points out that it was inconsistent for the ALJ to give controlling weight to the agency consultative examiners, who also examined Claimant only once.  Moreover, the ALJ once again cited to Claimant's infrequent treatment for a reason to reject Dr. Torres' findings.  She also noted that Dr. Torres' opinion lacked support because Claimant generally improved with Zoloft.  For the same reasons these reasons failed in the ALJ's credibility determination, they fail on this issue.  Because the ALJ did not support her decision to deny controlling weight to Dr. Torres' opinion, remand is required.

## CONCLUSION

For the aforementioned reasons, Claimant's motion for reversal or remand is granted and the Commissioner's motion for summary judgment is denied.  This case is remanded to the SSA for further proceedings consistent with this opinion.

_Michael T. Mason_
_____
**Michael T. Mason**
**United States Magistrate Judge**


**Dated: October 5, 2016**